IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

T'VON MAURICE CARTER,
    Plaintiff,

v.                               Civil Action No. 3:24cv293

SHERIFF ANTOINETTE IRVING, *et al.*,
    Defendants.

## OPINION

On April 21, 2023, the plaintiff, T'von Maurice Carter, a pretrial detainee housed at the Richmond City Justice Center ("RCJC"), incurred injuries after another inmate assaulted him while he slept. On April 21, 2024, Carter sued the defendant, Sheriff Antoinette Irving, under 42 U.S.C. § 1983 for violating Carter's Eighth Amendment right to protection (Count I), for supervisory liability (Count II), and for manifesting a policy or custom that violated Carter's Fourteenth Amendment rights (Count III). Carter also sued Irving and the other defendants, Deputies John Doe 1-20, for state law claims of gross negligence (Count IV) and willful and wanton negligence (Count VI). He additionally sues Irving for vicarious liability and *respondeat superior* (Count V). Carter also asks for punitive damages (Count VII).

Irving now moves for summary judgment on all claims. Because Carter fails to show that Irving violated his constitutional rights, the Court will grant summary judgment on all of Carter's § 1983 claims in favor of the Sheriff. Similarly, the record does not support Carter's gross negligence, willful and wanton negligence, and supervisory liability/*respondeat superior* claims.[1]

---

[1] Count VII, Carter's last claim, asks for punitive damages. That is a request for relief, not an independent cause of action, and as a result, the Court will not analyze it as a standalone claim. *Menerick v. Salem Heritage, LLC*, No. 1:23cv00010, 2023 WL 3818391, at *4 (W.D. Va. June 5, 2023) (explaining that there "is no support in Virginia law for an independent cause of action for

The Court will, therefore, grant the motion for summary judgment in favor of Irving.

## I. MATERIAL FACTS[2]

### A. RCJC Layout and Staffing

Irving is the sheriff for the City of Richmond. (ECF No. 31-1, at 6.)[3] Part of her duties as sheriff involve overseeing RCJC operations and the staff that work there. (*Id.* at 14–15.) RCJC has six floors, all of which house inmates. (*Id.* at 41–43.) Carter, a pretrial detainee, lived in Pod 5E.[4] (ECF No. 31-8, at 27, 28–29.) RCJC has body scanners on each floor to detect contraband, and deputies conduct "shakedowns" of the inmates in which they check the inmates' cells, clothing, and bodies to detect any contraband. (ECF No. 31-1, at 33, 75–76.) RCJC also has a Master Control center, the "most critical control point in [RCJC]," which has at least one deputy

---

punitive damages"). But because the Court is granting judgment in favor of the defendants on all other claims, the Court will not award Carter punitive damages.

[2] "In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Loc. Civ. R. 56(B).

Further, the Court does not have the responsibility to "comb through the record in search of facts relevant to summary judgment." *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017). In his brief in opposition, Carter fails to support many of his disputed facts with record citations. To the extent that the Court could find the support based on Carter's later citations in other areas of his brief, the Court reviewed the evidence to resolve the dispute. But where the Court could not find Carter's purported evidence through other citations, the Court is not required to consider those assertions.

[3] All record citations identify the documents and page numbers using ECF numbers and the page numbers assigned by the CM/ECF system. Where the CM/ECF system does not assign page numbers, the cites reflect the original page numbers of the documents.

[4] Throughout the plaintiff's opposition to the motion for summary judgment, Carter refers to his pod as "Pod 3E." (ECF No. 41, at 9, 12, 13, 20, 21, 23, 27.) The record, however, shows that Carter was actually housed in Pod 5E. (ECF No. 31-8, at 27, 28–29; ECF No. 31-10, at 20; ECF No. 31-13, at 2.)

assigned to it 24 hours a day. (ECF No. 31-2, at 5; ECF No. 31-1, at 48.) The deputy in Master Control can operate all the doors within RCJC. (ECF No. 31-1, at 47.)

Since 2018, RCJC has been "staff challenged," and Irving "would like to have more people, as all other agencies would." (ECF No. 41-2, at 20; *see* ECF Nos. 41-8, at 45.) The staffing problem started when the previous sheriff left office and Irving took control. (ECF No. 41-3, at 56.) Speaking specifically to the fifth and sixth floors of RCJC, Sergeant James Jones,[5] an employee of RCJC since 2014, indicated that having only two deputies and one sergeant for a floor of eight pods makes it difficult for staff to do their jobs. (*Id.* at 53.) To rectify the understaffing situation, RCJC has "upped" recruitment and advertising for staff through television commercials, "advertisements in shopping centers," "bulletin boards on the highway," wrapped vehicles with recruitment information, and job fairs. (ECF No. 41-1, at 21–22.)

### B. Supervision Models

RCJC employs both direct and non-direct models of inmate supervision. (ECF No. 31-1, at 62–64.) Direct supervision occurs when deputies always remain in a pod with the inmates. (*Id.* at 63–64.) Conversely, non-direct supervision occurs when deputies monitor all the pods on a specific floor of RCJC by video feed rather than assigning deputies to physically monitor inmates in the pods themselves. (*Id.* at 62–63, 68–69.) Under this model, one deputy watches the inmates

---

[5] Irving opposes Carter's reliance on Jones's testimony because Jones was deposed for the related case of *Wade v. Irving, et al.*, Case No. 3:24cv291 (E.D. Va.), and does not have personal knowledge of the staffing on Pod 5E or the events that occurred on April 21, 2023, making his testimony not relevant. At the outset, the Court consolidated discovery for this case and the *Wade* case. Additionally, under Federal Rule of Evidence 401, evidence is relevant if it makes a fact more or less probable and the fact is "of consequence"—a low threshold. The Court acknowledges that Jones does not have any knowledge about Carter, Pod 5E, or the incident on April 21, 2023, but he does have knowledge of staffing problems since Irving took over as sheriff. This evidence tends to make the fact more probable that RCJC as a whole was understaffed, which is of consequence to whether Carter suffered a substantial risk of harm. The Court, therefore, will consider Jones's deposition here.

from video feeds at duty station desks on each floor, while one to two other deputies move in and out of pods twice an hour to conduct security checks. (ECF No. 38-1, at 68–69, 83–84; ECF No. 31-2, at 2.) The deputy stationed at the duty station desk can control all the doors to the pods and within the pods. (ECF No. 31-1, at 68.) At some point in time, the pods had a desk with a computer station where a deputy would sit at the desk to monitor the pod. (*Id.* at 63–66.) During Irving's tenure, when RCJC no longer had deputies stationed in every pod, RCJC removed the computers from the desks when inmates broke them and to prevent the inmates from accessing the RCJC control systems from the computer.[6] (*Id.* at 65–66.)

RCJC was originally designed and built with the direct supervision model in mind.[7] (ECF No. 41-1, at 17.) Before Irving became sheriff, Sheriff Woody used a direct model of supervision

---

[6] Carter argues that the RCJC removed the computers from inside the pods when Irving moved to a non-direct supervision system. (ECF No. 41, at 4.) But the record does not support that allegation. Rather, Irving testified that they removed the computers for the two reasons mentioned here. (ECF No. 31-1, at 65–66.)

[7] These facts come from Sheriff Clarence T. Woody, Jr.'s deposition, who served as Sheriff for the City of Richmond from 2005–2017. (ECF No. 41-1, at 9.) In her reply brief, Irving asserts that Woody's deposition testimony is inadmissible at trial for two reasons. *See Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 704 (4th Cir. 2023) (explaining that a court "may not consider inadmissible evidence on a motion for summary judgment"). First, because Woody bases his testimony on his professional experience as a sheriff, it amounts to expert testimony. Because Carter did not designate Woody as an expert, Irving argues he may not rely on this testimony. (ECF No. 43, at 3; ECF Nos. 32, 33.) Second, Irving asserts that Woody's testimony is not relevant because his testimony is not based on RCJC's operations under Irving's tenure. (ECF No. 33, at 1.)

Federal Rule of Evidence 701 limits lay testimony to opinions that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." There is a "fine line" between Rule 701 lay witness testimony and Rule 702 expert witness testimony. *United States v. Denton*, 944 F.3d 170, 185 (4th Cir. 2019). "[L]ay opinion testimony *must* be based on personal knowledge" while expert testimony may include "firsthand observation and experience." *United States v. Perkins*, 470 F.3d 150, 155–56 (4th Cir. 2006). For example, in the context of law enforcement, an officer's testimony moves from lay to expert testimony when their testimony "is not based on personal

at RCJC. (*Id.* at 14.) RCJC first implemented its non-direct supervision model starting in late 2021 to early 2022, under Irving's tenure. (ECF No. 31-1, at 82.) Although the Virginia Administrative Code's minimum standards for jails and lockups allow for non-direct models of supervision, (ECF No. 31-18, at 12), Woody testified that a non-direct supervision model is "very dangerous" for staff and "extremely dangerous" for inmates because the inmates have "no supervision" and are "in control" of the pods, (ECF No. 41-1, at 15–16).

### C. Security Policy

RCJC's Policy 202 governing security operations ("the Security Operations Policy") outlines the building security protocol and the protocol for Pod 5E. (ECF No. 31-2, at 4.) Regarding Pod 5E and a variety of other pods, the policy states that "[a]t least one (1) deputy will be assigned to this housing area, as a permanent post and is responsible for security checks."[8] (*Id.*)

---

perception, but rather on law enforcement experience and after-the-fact investigation." *Denton*, 944 F.3d at 185.

Here, Carter claims that Woody has "personal observations and knowledge from his on-the-job experience" regarding jail operations and security procedures. (ECF No. 40, at 3.) Woody does have personal knowledge of how RCJC was structured, designed, and built because he was involved in that process. (ECF No. 41-1, at 17.) That testimony is admissible as lay testimony. But, beyond Carter's conclusory statement about Woody's personal observations regarding supervision models at RCJC, Carter fails to describe what those observations are that keep Woody's testimony in the realm of lay testimony instead of crossing the line into expert testimony that is based on Woody's job experience. Yet, the standard on a motion for summary judgment requires the Court to view the facts "in the light most favorable to the nonmoving party." *Somers v. Devine*, 132 F.4th 689, 695 (4th Cir. 2025). Additionally, Woody's testimony regarding supervision models is relevant to determine whether a substantial risk existed in using the non-direct supervision model at RCJC. *See* Fed. R. Evid. 401 (evidence is relevant if it tends to make a fact more or less probable and the fact is "of consequence.")

For the purposes of summary judgment, then, the Court will consider Woody's cited deposition testimony. For the reasons in this Opinion, however, the Court will enter judgment in favor of Irving even after considering Woody's testimony.

[8] The parties dispute the meaning of this provision. Carter argues that the policy states that a deputy must be stationed within Pod 5E at all times. (ECF No. 41, at 9.) Irving asserts that the policy does not state such a thing, and that the policy of the Sheriff's Office does not require direct

The policy requires deputies to conduct security checks of "assigned duty areas" twice an hour. (*Id.* at 2.)

### D. Deputy Training[9]

When new deputies start working at RCJC, they must participate in several different types of training. (ECF No. 31-5, at 2–4.)  The first ten days of a new hire's position consist of onboarding during which the new deputy receives classroom-style instruction on direct supervision, non-direct supervision, "de-escalation techniques, crisis intervention, emergency response procedures, and mental health training." (*Id.* at 3.)  The new deputy then shadows an experienced deputy and learns the day-to-day tasks of the job, including interacting with inmates, performing security checks, and handing out medicine with the medical staff. (*Id.*)  At some point during the first year on the job, all deputies go to the Virginia Justice Center Training Academy ("the Academy") for twelve to thirteen weeks to receive jailer certification and civil process training. (*Id.*)  After graduating from the Academy, the deputies participate in one more week of field training, where they try out different positions within RCJC and learn how to transport inmates and do "civil process." (*Id.* at 3–4.)  Deputies also participate in further in-service

---

supervision in all pods. (ECF No. 43, at 5–6.)  Because the policy is ambiguous based on the actual language regarding Pod 5E compared with that of other pods, the Court views the policy in the light most favorable to the nonmoving party, the plaintiff here.

[9] Carter argues that the testimony of three RCJC employees, Deputy Jeffrey Ceus, Sargeant Givhonor Copeland, and Lieutenant Karen Riley, shows that Irving failed to properly train the staff, because these employees could not articulate what the non-direct supervision model required. While true that these employees did not know how to respond when Carter's attorney asked what the non-direct supervision model entails, (ECF No. 41-4, at 53–56; ECF No. 41-5, at 38; ECF No. 41-7, at 24), the employees' other testimony shows that they know how to perform non-direct supervision on-the-job, (ECF No. 41-4, at 11; ECF No. 41-5, at 24; ECF No. 41-7, at 22).  The Court, therefore, does not consider these employees' testimony to support Carter's assertions that deputies were poorly trained.  The employees knew how to do the job, albeit not the proper terminology for the job they were doing.

trainings on topics that the supervisors feel need to be refreshed, such as defensive training, crisis management, and direct and non-direct supervision. (*Id.* at 4.)

The Virginia Department of Corrections ("VADOC") audits RCJC for compliance and safety, which occurred on September 27, 2022, and February 9, 2023. (*Id.* at 4–5.) During those audits, VADOC found RCJC 100% in compliance with the applicable standards, including deputy training. (*Id.* at 5, 6–38.)

### E.  The Incident

Carter first entered custody at RCJC on March 21, 2023, for firearm and drug possession. (ECF No. 31-8, at 10–11.) During the intake process, Carter told the staff that he did not have any known enemies within RCJC. (*Id.* at 25–27; ECF No. 31-9, at 2.) At the time of the incident, Carter was housed in Pod 5E.[10] (ECF No. 1, at ¶ 11.) He did not have a cellmate. (ECF No. 31-8, at 18.) Carter's cell had an intercom button inside to call deputies if needed, and RCJC also had intercom buttons stationed inside Pod 5E by the gym and the entrance doors. (*Id.* at 35–36; ECF No. 31-10, at 21–22.)

On April 21, 2023, around 9:13 a.m., Carter was in his cell sleeping with the door closed. (ECF No. 1, ¶ 13; ECF No. 31-15, at 0:00–0:50.) At 9:14 a.m., another inmate, Anthony Cradle, entered Carter's cell and closed the door. (ECF No. 31-15, at 0:50.) While in Carter's cell, Cradle

---

[10] In a footnote in his brief in opposition, Carter states that he was assigned to a mental health pod and implies that a deputy must always be physically stationed within a mental health pod. (ECF No. 41, at 4 n.9.) But Carter does not cite to any evidence supporting his assertion that he was assigned to a mental health pod, and the Court could not identify any evidence in the record that 5E was a mental health pod.

assaulted Carter and injured Carter's eye and head. (ECF No. 1, at ¶¶ 13, 16; ECF No. 31-8, at 18–19, 28.) At 9:19 a.m., Cradle left Carter's cell. (ECF No. 31-15, at 5:57–6:26.)[11]

At 9:24 a.m., Carter, wearing black pants and no shirt, left his cell, which was located on the second level of the two-floor pod. (*Id.* at 10:55.) He walked down the central staircase to talk to another inmate at a table located on the first floor, then walked back up the stairs and went into his cell. (*Id.* at 10:55–12:11.) Carter remained in his cell until 9:37 a.m. (*Id.* at 24:14.) At some point while Carter remained in his cell the second time, Carter used the intercom button in his cell to call the deputies again. (ECF No. 31-8, at 42–43; ECF No. 31-4, at 24.) Deputy Allyyiah Kamal, stationed at the fifth-floor duty station desk, answered the call and told Master Control to open the pod door to let Carter off of the unit. (ECF No. 31-4, at 24; ECF No. 31-15, at 24:53–25:06.) Carter then left his cell wearing an orange jumpsuit, walked down the stairs of Pod 5E, and over to the Pod 5E main door. (ECF No. 31-15, at 24:12–25:05.) Once Master Control opened the door to the pod, Carter left the pod and walked down the hallway to the fifth-floor duty station desk, where Kamal met him. (*Id.* at 25:05–25:39.)

Once Carter reached the duty station desk, Kamal pointed Carter to a triage room. (*Id.* at 25:42; ECF No. 31-4, at 25–26.) While walking to the triage room, Carter "collapsed" into Kamal's arms. (ECF No. 31-4, at 26; ECF No. 31-15, at 25:42–25:53.) Kamal called for a medical emergency, and both medical and non-medical staff responded to assist Carter. (ECF No. 31-4, at 26; ECF No. 31-15, at 29:45.) At the same time, deputies locked down Pod 5E. (ECF No. 31-15, at 28:30–29:45.)

---

[11] In his deposition, Carter testified that he pushed the intercom button in his cell for help immediately after the attack, but no one responded. (ECF No. 31-8, at 33, 41.) Neither Carter nor Irving mention this testimony as a material fact for summary judgment. The Court, then, does not include this fact as a material fact for summary judgment purposes.

Before this incident, Carter did not have issues with any inmates in Pod 5E, nor did he fear other inmates in his pod. (ECF No. 31-8, at 26–27.) Carter had also never told deputies or Irving that he felt unsafe in Pod 5E. (*Id.* at 28–29.)

### F. Deputy Duties

On the day of Carter's assault, RCJC did not have deputies physically stationed within Pod 5E itself, but did assign three people to staff the fifth floor: Kamal, Deputy Jeffrey Ceus, and Sergeant Craig Branch. (ECF No. 31-12, at 2–3.) Ceus conducted the security checks of Pod 5E while Kamal manned the fifth-floor duty station desk and watched the cameras. (ECF No. 31-10, at 35; ECF No. 31-4, at 22.) Before the incident that day, Ceus conducted security checks of Pod 5E at 7:25 a.m., 7:55 a.m., 8:05 a.m., 8:30 a.m., and 9:11 a.m.[12] (ECF No. 31-13; at 2.) Ceus also helped the nurse conduct a pill pass in Pod 5E at 9:03 a.m. (ECF No. 31-13, at 3; ECF No. 31-10, at 75; ECF No. 31-14, at 2.) Ceus did not see anything amiss during his rounds that morning. (ECF No. 31-10, at 76–77.)

### G. Post-Incident Actions

On April 26, 2023, days after the assault, two staff members from the Sheriff's Office interviewed Carter about the incident. (ECF No. 31-16.) Carter indicated that he did not know what happened to cause his eye injury or whether someone hit him. (ECF No. 31-16, at 1:00–1:19.) Carter additionally acknowledged that, once he left Pod 5E to receive medical attention, RCJC did not assign him back to that pod. (ECF No. 31-16, at 9:00–9:10.) That same day, the Sheriff's Office had a hearing for Cradle and found him guilty of assaulting Carter. (ECF No. 31-

---

[12] In his opposition brief to the motion for summary judgment, Carter writes in a footnote that "[t]here is a material dispute regarding whether proper security checks were performed" on April 21, 2023. (ECF No. 41, at 2 n.5.) Carter does not explain further or cite to the record to support his proposition.

17.)  The disciplinary sanction included 12 days of isolation.  (*Id.*)  Cradle had past issues of "a

physical altercation here and there before" the assault on Carter.  (ECF No. 31-6, at 40.)

## II. DISCUSSION[13]

### A. § 1983 Failure to Protect Claim (Count I)

#### 1. Legal Standard

Section 1983 "provides a method for vindicating federal constitutional . . . rights" when a

person acting under the color of law violates those rights. *Jones v. Chandrasuwan*, 820 F.3d 685,

691 (4th Cir. 2016).  Carter asserts a § 1983 failure to protect claim against Irving, arguing that

the Eighth Amendment generally requires prison officials to "take reasonable measures to

guarantee the safety of the inmates." *Cox v. Quinn*, 828 F.3d 227, 235 (4th Cir. 2016) (quoting

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  While the Eighth Amendment does require such

protection for convicted prisoners, pretrial detainees like Carter must seek § 1983 relief under the

Fourteenth Amendment's Due Process Clause.  *See Short v. Hartman*, 87 F.4th 593, 605 (4th Cir.

---

[13] Pursuant to Federal Rule of Civil Procedure 56(a), a court "shall grant summary
judgment if the movant shows that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "'A fact is material if it
might affect the outcome of the suit under the governing law.' A dispute is 'genuine' if 'a
reasonable jury could return a verdict for the non-moving party.'" *Knibbs v. Momphard*, 30 F.4th
200, 213 (4th Cir. 2022) (citation omitted) (first quoting *Libertarian Party of Va. v. Judd*, 718 F.3d
308, 313 (4th Cir. 2013); and then quoting *Strothers v. City of Laurel*, 895 F.3d 317, 326 (4th Cir.
2018)).

Upon a motion for summary judgment, the court draws all reasonable inferences in the
nonmoving party's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and views
the facts "in the light most favorable to the nonmoving party," *Somers*, 132 F.4th at 695. But when
the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing
"affidavits" or "'depositions, answers to interrogatories, and admissions on file,' designate
'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S.
317, 324 (1986) (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

2023). The Court, therefore, will analyze Carter's failure-to-protect claim as if he alleged the claim under the Fourteenth Amendment in his complaint.

### a. The Evolution of a Fourteenth Amendment Deliberate Indifference Claim

Prior to the Fourth Circuit's decision in *Short*, 87 F.4th 593, the Fourth Circuit applied the same two-part test in a failure to protect claim alleged by convicted persons under the Eighth Amendment as that for pretrial detainees under the Fourteenth Amendment. The deliberate indifference test required the plaintiff to demonstrate (1) that he was subjected to an objective, substantial risk of serious harm and (2) that the person acting under color of law subjectively recognized and disregarded the risk of harm. *See Younger v. Crowder*, 79 F.4th 373, 382 (4th Cir. 2023); *Stevens v. Holler*, 68 F.4th 921, 931 (4th Cir. 2023); *Michelson v. Coon*, No. 20-6480, 2021 WL 2981501 at *3 (4th Cir. Jul. 15, 2021) (applying the standard in a failure to protect claim).

The Fourth Circuit overturned this precedent in *Short*, however, holding that a pretrial detainee's deliberate indifference claim under the Fourteenth Amendment is "solely an objective one." 87 F.4th at 609 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015)). Clarifying further, the Fourth Circuit explained, "[t]he objective test we adopt today differs from our prior subjective test in one respect only. The plaintiff no longer has to show that the defendant had actual knowledge . . . and consciously disregarded the risk." *Id.* at 611. The Fourth Circuit did not alter the first prong of the two-part test, however, which remains the same as that for an Eighth Amendment claim: the plaintiff must first show that the defendant "exposed him 'to an objectively substantial risk of serious harm.'" *Carmona v. Martin*, No. 23-6930, 2024 WL 4490695 at *2 (4th Cir. Oct. 15, 2024) (quoting *Younger*, 79 F.4th at 382).

### b. First Prong: Substantial Risk of Harm

Not every injury "suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 831. In asserting a § 1983 failure to protect claim for an attack by another inmate, the plaintiff first must have suffered "a serious deprivation of rights in the form of serious or significant physical or emotional injury." *Danser v. Stansberry*, 772 F.3d 340, 346 (4th Cir. 2014); *see Prigg v. Balt. Cnty. Dep't of Corr.*, No. DLB-23-48, 2024 WL 1012885, at *5 (D. Md. Mar. 8, 2024) (applying the standard to a Fourteenth Amendment failure to protect claim). In lieu of a serious injury, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. To determine this, the court must conduct an objective inquiry to "'assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.'" *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).

### c. Second Prong: Deliberate Indifference

For the second part of the failure-to-protect claim, the plaintiff must demonstrate the defendant's "deliberate indifference to a serious risk of harm on the purely objective basis that the 'governmental action' [that the plaintiff challenges] is not 'rationally related to a legitimate nonpunitive governmental purpose' or is 'excessive in relation to that purpose.'" *Short*, 87 F.4th at 611 (quoting *Kingsley*, 576 U.S. at 398). As discussed earlier, the deliberate indifference test under a Fourteenth Amendment claim is "solely an objective one." *Id.* at 609; *see Hammock v. Andoh*, No. 22-7159, 2024 WL 33694 at *1 (4th Cir. Jan. 3, 2024) ("[A] pretrial detainee's failure-to-protect claim must be evaluated under an entirely objective standard."). To demonstrate

12

deliberate indifference for a Fourteenth Amendment claim, then, "it is enough that the plaintiff show that the defendant acted or failed to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Short*, 87 F.4th at 607 (internal citation omitted).

## 2. *Analysis*

### a. *Substantial Risk of Harm*

Carter argues that he faced a serious risk of harm[14] because RCJC was understaffed and used a non-direct model of inmate supervision. He also argues that, since RCJC was designed specifically for a direct supervision model, the use of non-direct supervision at RCJC is unconstitutional. The question, then, is whether a genuine dispute of material fact exists that RCJC's understaffing and non-direct supervision model posed a substantial risk of serious harm such that "society" would consider the conditions "so grave" that it would not "expose *anyone* unwillingly to such a risk." *Raynor*, 817 F.3d at 127; *see Farmer*, 511 U.S. at 834. The record creates such a dispute of material fact.

To support his understaffing claim, Carter cites Irving's deposition testimony that RCJC has been "staff challenged," (ECF No. 41-2, at 20), Jones's deposition testimony about the difficulties of understaffing he experienced on the fifth and sixth floors of RCJC, (ECF No. 41-3, at 53), and Deputy Allyyiah Kamal's deposition testimony that RCJC had been short staffed, (ECF Nos. 41-8, at 45). Irving presents RCJC evidentiary records that show that three people staffed

---

[14] While a plaintiff can show serious physical injury to meet this element, few facts exist in the briefing and summary judgment exhibits presented by the parties about the injuries Carter sustained from the assault. Because the parties focus their summary judgment arguments on substantial risk of harm rather than serious harm, the Court does also. Regardless of whether the Court analyzed this first prong under serious risk of harm or serious injury, Carter fails to meet the deliberate indifference prong of his failure-to-protect claim.

the fifth floor of RCJC, which includes Pod 5E, during the relevant shift on the day of Carter's

incident. (ECF No. 31-12.)  Based on (1) Jones's testimony that three staff members covering a

floor created difficulties and potentially unsafe measures for inmates, and (2) the evidence that

Carter's floor only had three people covering it on the day of the incident, a reasonable person

could find a substantial risk of harm created by understaffing.

Regarding the method of inmate supervision, the record supports the conclusion that a

reasonable person might find that a non-direct supervision model is such a risk that "society"

would consider the conditions "so grave" that it would not "expose *anyone* unwillingly to such a

risk." *Raynor*, 817 F.3d at 127.  The Virginia Administrative Code's minimum standards for jails

and lockups allow for such a model of supervision.  (ECF No. 31-18, at 12); *see* 6 VAC 15-40-

1045.  And at least one court has found that the non-direct supervision model does not violate

constitutional protections to keep inmates safe.  *See Dockery v. Hall*, 443 F. Supp. 3d 726, 746–

47 (S.D. Miss. 2019), *aff'd*, 7 F.4th 375 (5th Cir. 2021) (holding that the non-direct supervision

model at that jail did not create a substantial risk of harm and that the defendants were not

deliberately indifferent to prisoner-on-prisoner violence).  Sheriff Woody, however, testified that

the non-direct supervision model is "extremely dangerous"[15] for inmates. (ECF No. 41-1, at 15–

16.)  A reasonable juror, therefore, may find that RCJC's conditions at the time of Carter's incident

created a substantial risk of harm.

But the inquiry does not end there.  To survive a defendant's motion for summary

judgment, a plaintiff must show a genuine dispute of material fact for each element of a claim that

they bear the burden of proof on at trial.  *See Celotex Corp.*, 477 U.S. at 322–23 (1986) ("Rule

---

[15] Because Carter asserts that Woody has personal knowledge of the dangerousness of a
non-direct supervision model, though he does not support that claim otherwise, and the Court must
view the facts in the light most favorable to Carter here, the Court considers Carter's testimony.

56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case."); *Banca Cremi S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1027 (4th Cir. 1997) ("A factual issue raised by the [plaintiff] is only genuine if a reasonable jury could return a verdict for the [plaintiff] on each element necessary to its case."). As the party with the burden of proof at trial, it is not enough for Carter to only create a genuine dispute of material fact as to this first element of his failure to protect claim to defeat summary judgment. The Court, therefore, considers the next element of Carter's failure to protect claim.

### b. Deliberate Indifference

The question for this second prong asks whether, objectively, Irving failed to act in the face of an "unjustifiably high risk of harm that is either known or so obvious that it should be known." *Short*, 87 F.4th at 607. Carter asserts that RCJC's understaffing and use of the non-direct supervision model creates such a risk of harm. He also states that Irving's "office had knowledge—through past incidents, jail conditions, or inadequate supervision—of a substantial risk of harm in Pod [5E]." (ECF No. 41, at 17.) Carter lastly asserts that Cradle, the inmate who attacked him, had a history of violence with other inmates.

First, as discussed above, conflicting views exist about the risks posed by the non-direct supervision model. The Virginia Administrative Code allows for non-direct supervision, and at least one United States District Court has found that it is not dangerous. *See* 6 VAC 15-40-1045; *Dockery*, 443 F. Supp. 3d at 746–47. But Woody testified otherwise. (ECF No. 48-1, at 15–16.) These conflicting opinions establish that, though a risk may have existed, it was neither "known" or "so obvious that it should be known" sufficient to establish that Irving acted with deliberate indifference. *Short*, 87 F.4th at 607.

Second, Carter only presents evidence that understaffing occurred but does not provide evidence that Irving did not act to rectify the situation or acted indifferently to it. Rather, Irving's testimony shows that Irving and RCJC have tried several recruitment strategies to attract potential staff: television commercials, "advertisements in shopping centers," "bulletin boards on the highway," wrapped vehicles with recruitment information, and job fairs. (ECF No. 41-2, at 21–22.) Such strategies demonstrate an active effort to increase staffing, not a failure to act in the face of these purported risks. No evidence exists, then, that Irving acted with deliberate indifference to staffing shortages.

Third, Carter highlights that Irving's "office had knowledge—through past incidents, jail conditions, or inadequate supervision—of a substantial risk of harm in Pod [5E]." (ECF No. 41, at 17.) But Carter does not introduce any evidence that Irving's office knew about a pattern of incidents that created a risk of harm in Pod 5E. Nothing in the record shows any pattern of past incidents, poor jail conditions, or inadequate supervision in Pod 5E. Thus, objectively, Irving did not act with deliberate indifference to the risks that Carter asserts here.

Finally, addressing the specific events on April 21, 2023, neither Irving nor any of the staff at RCJC were deliberately indifferent to potential danger between Carter and Cradle. Carter and Cradle had not had problems with each other before that date. While one staff member testified that Cradle had "a physical altercation here and there before" with other inmates, fights are not unexpected in prison. (ECF No. 31-6, at 40). There is no evidence in the record that Cradle was inherently dangerous or such a known threat that the staff needed to protect Carter from him. *See King v. Riley*, 76 F.4th 259, 266 n.7 (4th Cir. 2023) ("We have explicitly rejected the idea that knowledge of a general risk of violence in a prison unit can establish deliberate indifference."). In responding to the situation, RCJC immediately placed Carter in a new pod after he left Pod 5E to

receive medical attention. Additionally, Carter never reported to staff that he felt unsafe while at RCJC, and he told staff on intake that he had no known enemies in RCJC. Irving, then, did not act with deliberate indifference to Carter's safety that day.

Because Carter "fails to make a showing sufficient to establish the existence of an element essential to [his] case," the Court will grant summary judgment for Irving on Count I.[16]  *See Celotex Corp.*, 477 U.S. at 322–23 (1986).

### B. § 1983 Supervisory Liability Claim (Count II)

"Supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Johnson v. Robinette*, 105 F.4th 99, 123 (4th Cir. 2024) (quoting *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994)). The elements of a § 1983 supervisory liability claim require the plaintiff to prove:

> (1) that the supervisor had actual or constructive knowledge that [her] subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff;
>
> (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and
>
> (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* (quoting *Shaw*, 13 F.3d at 799).

At a minimum, Carter does not demonstrate a constitutional injury that satisfies the third factor of a § 1983 supervisory liability claim. Carter's sole basis for supervisory liability is that the deputies should have abided by the direct supervision model rather than the non-direct

---

[16] Irving raises a qualified immunity argument to this claim as well. Because the Court grants summary judgment on the merits in favor of Irving, the Court need not address the qualified immunity argument.

supervision model. He asserts that RCJC's Security Operations Policy requires deputies to be stationed within mental health pods at all times, and, because the deputies did not do this, Irving is responsible for the risk of harm created by not enforcing the policy.

First, nothing in the record supports Carter's claim that Pod 5E was a designated mental health pod. At best, the Security Operations Policy is ambiguous as to whether it requires deputies to employ a direct supervision model in Pod 5E. (ECF No. 31-2, at 1–3.) But, even viewing the evidence in the light most favorable to Carter—that is, that the policy requires a direct supervision model—a "violation of departmental policy does not equate with constitutional unreasonableness." *Abney v. Coe*, 493 F.3d 412, 419 (4th Cir. 2007); *see Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013) (per curiam) (holding that "prison officials' failure to follow internal prison policies are not actionable under § 1983 unless the alleged breach of policy rises to the level of a constitutional violation.") And Carter does not assert that the individual deputies did something specific to violate his constitutional rights, other than perform their duties using the non-direct supervisory model. Additionally, the Court has already found that Irving and the staff did not fail to protect Carter under the Fourteenth Amendment because they did not act with deliberate indifference. Without a constitutional harm, Carter cannot succeed on a § 1983 supervisory liability claim. Accordingly, the Court will grant summary judgment on Claim II in favor of Irving.

### C. Monell Claim (Count III)

"To make out a case for departmental liability under [*Monell*], [a plaintiff] must show both that he has suffered a constitutional harm and that the harm was the result of the Department's unconstitutional policy or custom." *English v. Clarke*, 90 F.4th 636, 649 (4th Cir. 2024) (citing *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658 (1978)); *see Covenant Media of SC,*

18

*LLC v. City of N. Charleston*, 493 F.3d 421, 436 (4th Cir. 2007) (explaining that, to prove a *Monell* claim, the plaintiff must show that (1) their harm "was caused by a constitutional violation," and (2) that "the city is responsible for that violation").

In support of his *Monell* claim, Carter argues that he suffered a constitutional violation "due to Sheriff Irving's deliberate indifference" because the deputies followed the non-direct supervision model. (ECF No. 41, at 24.) But, as the Court already explained, Irving's actions and the use of the non-direct supervision model do not amount to a deliberate indifference to a serious risk of harm. Because a *Monell* claim requires a constitutional violation and the record does not support one, the Court will grant the motion for summary judgment as to Count III.

### D. Gross Negligence (Count IV)

To prove gross negligence in Virginia, the plaintiff must demonstrate "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Commonwealth v. Giddens*, 295 Va. 607, 613, 816 S.E.2d 290, 294 (2018) (quoting *Cowan v. Hospice Support Care, Inc.*, 268 Va. 482, 487, 603 S.E.2d 916, 918 (2004)). "[A] claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Elliott v. Carter*, 292 Va. 618, 622, 791 S.E.2d 730, 732 (2016). Even ineffectual or inadequate efforts may meet the required degree of care, provided the efforts "were not so insufficient as to constitute the indifference and utter disregard of prudence that would amount to a complete neglect for [an individual's] safety." *Id.* at 623, 733.

Irving and her staff did not act with gross negligence for the same reasons that Irving did not act with deliberate indifference in the failure-to-protect claim. Nothing in the record supports that Irving completely disregarded Carter's care such that she "complete[ly] neglect[ed]" Carter's

safety. *Giddens*, 295 Va. at 613, 816 S.E.2d at 294. RCJC actively recruited to fill staff positions to resolve understaffing problems. The staff exercised at least some degree of care when they monitored the cameras for each pod from the duty station and conducted checks of the pod twice an hour. And, when Carter used his cell's intercom to call for medical assistance, Kamal let him off of the pod and immediately sought medical attention for his injuries. All these facts undermine any claim that the deputies and Irving acted with gross negligence or with indifference to Carter's safety.

Additionally, beyond the understaffing issues and non-direct supervision model, Carter asserts that removing the computers and monitoring stations from the in-pod deputy stations contributes to gross negligence. But removing that in-pod technology did not remove video monitoring of the pods entirely, it just moved the deputy monitoring station from inside the pods to a centralized duty station in the hallway outside the pods. The staff assigned to the deputy stations on each floor still continuously monitored the inmates by video feed.

Carter lastly mentions that "deputies repeatedly falsified records regarding security checks—an issue so pervasive that a Board of Local and Regional Jails compliance plan was required to address it." (ECF No. 41, at 28.) But Carter does not attach such a plan or report to his brief in opposition, and does not otherwise present evidence to the Court of such a plan or falsified records. The Court, therefore, will grant the motion for summary judgment on Count V.

### E. Willful and Wanton Negligence (Count VI)[17]

To prove a willful and wanton negligence claim, the plaintiff must show that the defendant acted "consciously in disregard of another person's rights or act[ed] with reckless indifference to

---

[17] In Carter's Complaint, his claim for willful and wanton negligence (Count VI) follows his *respondeat superior* claim (Count V). For clarity, the Court considers these claims in a different order than presented in the Complaint.

the consequences." *Riddick v. Watson*, 503 F. Supp. 3d 399, 425 (E.D. Va. 2020) (quoting *Cowan*, 268 Va. at 486–87, 603 S.E.2d at 918–19). The defendant must be "aware, from [her] knowledge of existing circumstances and conditions, that [her] conduct probably would cause injury to another." *Cowan*, 268 Va. at 487, 603 S.E.2d at 919. "Willful and wanton conduct involves an even greater degree of culpability than gross negligence. A plaintiff that fails to prove gross negligence has, by definition, failed to prove willful and wanton conduct." *Cantrell v. McCoy*, 553 F. Supp. 3d 295, 307 (W.D. Va. 2021).

Because Carter's gross negligence claim fails, his wanton and willful negligence claim fails, too. The Court, therefore, will grant the motion for summary judgment on Count VI.

### F. Vicarious Liability/Respondeat Superior (Count V)

A plaintiff may hold an employer responsible for the torts of its employees under the doctrine of *respondeat superior* when "*the service itself*, in which the tortious act was done, was within the ordinary course of the employer's business, meaning when the employee committed the tort while performing a normal function of his assigned job." *Our Lady of Peace, Inc. v. Morgan*, 297 Va. 832, 844, 832 S.E.2d 15, 23 (2019) (internal citations omitted). Such liability "may also attach to Virginia sheriffs with respect to the tortious conduct of his or her deputies." *Riddick*, 503 F. Supp. 3d at 427.

Here, Carter does not allege that the deputies working under Irving committed any such tortious conduct apart from the gross negligence and willful and wanton negligence that the Court

21

already addressed above.  The Court, therefore, will grant the motion for summary judgment on Count V.

### III. <u>CONCLUSION</u>

Because the record does not support that Carter suffered a constitutional violation or that Irving or the deputies acted with sufficient culpability to meet the requirements of any of his claims, the Court will grant Irving's motion for summary judgment on Counts I–VII.[18]  (ECF No. 30).

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: 11 June 2025
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

---

[18] Again, Count VII, which asks for punitive damages, does not amount to a standalone claim, and the Court will not award punitive damages because all of Carter's other claims fail.